IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

LAWRENCE LEE HAYES, JR.,

*Defendant*.

Criminal No.: ELH-11-258

**MEMORANDUM OPINION**

In this large scale drug conspiracy case, defendant Lawrence Lee Hayes, Jr., through retained counsel, has filed a motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  *See* ECF 609; ECF 611.  It is supported by various exhibits.  ECF 611-1 to ECF 611-4.

Hayes and five others were indicted in federal court on May 5, 2011, and charged with conspiracy to distribute and possess with intent to distribute five kilograms or more of a mixture or substance containing cocaine, in violation of 21 U.S.C. § 846.  ECF 1.[1]  A Superseding Indictment was filed in August 2011.  ECF 59.  Pursuant to a Plea Agreement (ECF 110), on May 10, 2012, Hayes entered a plea of guilty to the Superseding Indictment.  ECF 109.  The plea was tendered under Fed. R. Crim. P. 11(c)(1)(C), by which the parties agreed to a sentence of imprisonment of 180 months.  ECF 110, ¶¶ 9, 10.  At sentencing on August 8, 2012 (ECF 142), the Court imposed the agreed upon sentence.  ECF 144.

The government filed an opposition.  ECF 624.  It is supported by many exhibits.  ECF 624-1 to ECF 624-6.  The defendant replied.  ECF 627.  Thereafter, Hayes filed a supplement to

---

[1] As noted, *infra*, other coconspirators were charged by the State of Maryland.

his motion, docketed at ECF 662, supported by an additional exhibit.  ECF 662-1.  I shall refer to

ECF 609, ECF 611, ECF 627, and ECF 662 collectively as the "Motion."

Defendant was recently transferred by the Bureau of Prisons ("BOP") to a halfway house.[2]

Nevertheless, in response to the Court's inquiry (ECF 676), his attorney indicates that Hayes seeks

to pursue his Motion, even though he is "aware that the Courts have been backlogged with

compassionate release petitions . . . ."  ECF 677.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall deny the

Motion.

## I. Factual Background

On May 5, 2011, a federal grand jury in Maryland returned an Indictment against Hayes

and five others: Richard Anthony Wilford; Bryan Eammon Williams; George Lamar Plunkett;

Mark Anthony Hawkins; and Robert Nyakana.  They were charged with conspiracy to distribute

and possess with intent to distribute five kilograms or more of a mixture or substance containing

cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846.  ECF 1.  According to the Indictment, the

conspiracy spanned the period from August 2010 to May 2011.  *Id*.  A Superseding Indictment

was filed on August 25, 2011, adding a forfeiture count.  ECF 59; *see also* ECF 60; ECF 61.

As noted, pursuant to a Plea Agreement (ECF 110), Hayes entered a plea of guilty on May

10, 2012, to the charge of conspiracy set forth in the Superseding Indictment.  ECF 109.  The

parties agreed to recommend jointly a sentence of 180 months of imprisonment, pursuant to Fed.

R. Crim. P. 11(c)(1)(C).  ECF 110, ¶ 9.  Furthermore, the parties stipulated to a base offense level

of at least 36, based on the quantity of cocaine involved, and stipulated that defendant was a career

offender, yielding an offense level of 37.  ECF 110, ¶ 6a.  The parties contemplated a three-level

---

[2] The Court does not know the date of Hayes's transfer to the halfway house.

deduction for acceptance of responsibility under § 3E1.1 of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), resulting in a final offense level of 34.  ECF 110, ¶ 6. And, the parties agreed that because Hayes was a career offender, his criminal history category was VI.  *Id*. ¶ 7.

The Plea Agreement included a skeletal stipulation of facts.  *Id*. at 10.  According to the stipulation, from August 2010 through May 2011, Hayes was a member of a cocaine trafficking organization in and around Baltimore.  *Id*. at 10.  Hayes conspired to obtain large quantities of cocaine from sources of supply in California and ship the cocaine to California, where it was processed and packaged for distribution in the Baltimore metropolitan area.  *Id*.  The defendant and his coconspirators conspired to distribute, and possess with the intent to distribute, at least 50 kilograms but less than 150 kilograms of cocaine.  *Id*.

Despite this bare stipulation, the Court is quite familiar with the details of the extensive drug trafficking conspiracy in question.  This is because I presided over several motions hearings as well as the jury trial of codefendant Richard Wilford.  Therefore, to the extent pertinent as to Hayes, I shall summarize the facts that were proven beyond a reasonable doubt at Wilford's trial.[3]

In late August and early September of 2010, law enforcement began an investigation of Hayes.  ECF 273 (Wilford Presentence Report), ¶ 7.  Then, on two occasions in October of 2010, investigators observed Hayes with Wilford at 30th and St. Paul Streets in Baltimore City.  *Id*. ¶ 8.

During the first meeting, Wilford took a large cardboard box from his Ford pick-up truck and gave it to Hayes.  *Id*.  During the second meeting, Wilford took a backpack from Hayes's car

---

[3] For convenience, I rely largely on the factual summary contained in the Presentence Report for codefendant Wilford. Moreover, the trial transcripts are docketed at ECF 304, ECF 305, ECF 306, ECF 307, ECF 308, ECF 309, and ECF 310. And, as mentioned, during the pendency of the case, I held several motions hearings.  In addition, I issued several written opinions.

and Hayes took a large cardboard box from Wilford's pick-up truck.  ECF 273, ¶ 8.  The boxes exchanged between Wilford and Hayes during both meetings were identical in size.  *Id*.  After both meetings, Hayes drove to 1190 W. Northern Parkway, known as the Belvedere Towers Apartments ("Belvedere Towers"), and took the cardboard boxes inside.  *Id*. ¶ 7.  It was later determined that Apartment 717 at the Belvedere Towers was rented and occupied by coconspirator Michael Smooth.  *Id*. ¶¶ 7, 12.

After the October meetings, agents learned that Wilford owned a large home on Rock Hollow Court in Cecil County, Maryland, as well as a residence at 1500 Cliftview Avenue in Baltimore City.  *Id*. ¶ 8.  In November 2010, agents observed codefendant George Plunkett at a residence located at 301 W. 27th Street in Baltimore.  *Id*. ¶ 9.  Then, on November 12, 2010, agents again observed Wilford and Hayes together at 30th and St. Paul Streets.  *Id*.

Surveillance continued and on December 2, 2010, agents again saw Hayes and Wilford meet at 30th and St. Paul Streets in Baltimore.  *Id*. ¶ 10.  Plunkett's vehicle was also located in the area.  *Id*.  Hayes left the location and again went to Belvedere Towers with Plunkett.  *Id*.  Plunkett took a large cardboard box and carried it into the apartment building.  *Id*.  About two weeks later, agents again observed Hayes and Wilford at 30th and St. Paul Streets.  *Id*.  Hayes exited his vehicle and entered Wilford's vehicle.  *Id*.  They later left the area in Wilford's vehicle and went to Belvedere Towers.  *Id*.  Hayes exited Wilford's vehicle carrying a large cardboard box.  *Id*.  The boxes appeared to be the same size as the boxes exchanged between Wilford and Hayes in October 2010.  In addition, in January 2011, agents learned that Wilford, using a fictitious name, was shipping packages to a fictitious person in California.  *Id*. ¶ 11.

In February 2011, agents observed Hayes enter Apartment 717 at Belvedere Towers, carrying a large cardboard box.  *Id*. ¶ 12.  Plunkett entered the apartment a few minutes later.  *Id*.

The men then left the apartment.  ECF 273, ¶ 12.  Plunkett was seen carrying two large cardboard boxes and a small white plastic bag, which he tossed into a nearby dumpster.  *Id*.  The agents then went to the dumpster and recovered four computer boxes, two Compaq computer shells, and the bag that Plunkett had discarded.  *Id*.  The bag contained drug packaging material with cocaine residue, as well as other drug packaging paraphernalia.  *Id*.  One of the boxes had a shipping label with a recipient address of 35 Mainview Court in Reisterstown, Maryland, a residence owned by coconspirator Derrick Barbour.  *Id*.  The investigation revealed that Wilford's vehicle was at 35 Mainview Court on February 9, 2011, at the same time that the package was delivered to the residence.  *Id*.  The boxes were the same size as the boxes exchanged previously between Wilford and Hayes.  *Id*.

On March 15, 2011, Hayes was observed standing next to his vehicle, which was parked at 301 W. 27th Street in Baltimore.  *Id*. ¶ 13.  Wilford was also present, standing next to his vehicle.  *Id*.  Hayes then placed two bags into Wilford's vehicle and each coconspirator left the area in his own vehicle.  *Id*.

Two days later, on March 17, 2011, Wilford and codefendant Mark Hawkins were seen at a Staples store in Towson.  *Id*. ¶ 14.  Wilford was observed exiting the Staples store with boxes and packaging material.  *Id*.  The boxes were described as looking smaller than the boxes exchanged between Wilford and Hayes in October and December 2010.  *Id*.  Wilford and Hawkins appeared to be preparing several boxes for shipment.  *Id*.  Wilford placed two boxes in Hawkins's vehicle and then took one of the boxes into the Staples store.  *Id*.  Wilford took the other two boxes to other Staples stores.  *Id*.

Agents then obtained a shipping manifest from the Towson Staples store and learned that Wilford's package listed the sender and receiver under the same fictitious names that agents

learned about earlier.  ECF 273, ¶ 14.  The package was again destined for California.  *Id*.  The agents obtained a search warrant for the package.  A search of the box revealed a hollowed-out DVD/VCR player containing $100,000 in cash.  *Id*.

About two weeks later, on March 30, 2011, agents observed Wilford and Hawkins together in Baltimore City.  *Id*. ¶ 15.  Wilford gave Hawkins a large cardboard box, which was the same size as the boxes exchanged previously between Wilford and Hayes.  *Id*.  Hawkins took the box to 1500 Cliftview Avenue and placed the box inside of the residence.  *Id*.  Shipping records revealed that a package was delivered to 35 Mainview Court on that same day.  *Id*.

Hayes met with Wilford and Plunkett at a barbershop in Baltimore on April 1, 2011.  *Id*. ¶ 16.  Wilford was subsequently observed entering the residence located at 1500 Cliftview Avenue. *Id*.  Agents observed a DVD/VCR player in the rear of Wilford's vehicle, identical to one seized on March 17, 2011.  *Id*.  Later that day, Hawkins, along with Anthony Uzondo and Pierre Bantan, were observed exiting 1500 Cliftview Avenue.  *Id*.  Testimony at trial revealed that Uzondo and Bantan flew from Los Angeles to Baltimore on April 1, 2011, and transported money back to California that same day.  *Id*.

On April 3, 2011, law enforcement agents in Clark County, Illinois stopped a Penske tractor trailer truck operated by codefendant Robert Nyakana.  *Id*. ¶ 17.  During a search of the trailer, law enforcement discovered approximately 136 kilograms of cocaine inside ten black bags.  *Id*.  The cocaine had a street value of $13.6 million.  ECF 183 (Nyakana Presentence Report), ¶ 12.  The agents learned that the cocaine was loaded on the truck in California, and that codefendant Bryan Eammon Williams assisted in loading the cocaine onto the truck and was to receive the shipment in Jessup, Maryland.  ECF 273, ¶ 17.  Agents also learned that Nyakana was to receive over $200,000 as payment for the transportation of the cocaine.  *Id*.

Nyakana and Williams were arrested on April 4, 2011.  ECF 273, ¶ 17.  Approximately $269,000 in U.S. currency was seized from the trunk of Williams's vehicle.  *Id.*  Telephone calls between Williams and Hayes indicated that Williams supplied cocaine to Hayes.  *Id.*

Agents saw Plunkett enter Belvedere Towers on April 18, 2011, and then exit with a large bag.  *Id.* ¶ 18.  Plunkett entered his vehicle and drove to 301 W. 27th Street.  When he exited the residence,  Plunkett had a dark garbage bag and a small backpack in his hands.  *Id.*  He placed the garbage bag in the rear seat of his vehicle and drove to Belvedere Towers.  *Id.*  Plunkett entered the stash apartment, exited a few minutes later, drove his car to a dumpster at the building, and discarded the trash bag.  *Id.*  Agents retrieved the garbage bag from the dumpster.  *Id.*  They recovered paper towels, two boxes of baking soda, and several vacuum sealed bags that had been opened.  *Id.*  The bags tested positive for cocaine residue.  *Id.*

Wilford was also observed in April and May 2011 at Seapines Circle in Baltimore County.  *Id.* ¶ 19.  On April 19, 2011, Wilford was observed leaving a residence located on Seapines Circle with a large duffel bag.  *Id.*  Wilford was followed to a bank, where he made a cash deposit.  *Id.*

Agents observed a UPS truck in front of 1500 Cliftview Avenue on April 22, 2011.  *Id.* ¶ 20.  The UPS driver took a large cardboard box to the residence, but no one was there.  *Id.*  The box appeared to be the same size as the boxes exchanged previously between Wilford and Hayes.  *Id.*  The driver took the box back to the truck and waited.  *Id.*  Hawkins and Wilford then arrived in Hawkins's vehicle.  The driver gave Hawkins the cardboard box, and Hawkins took it inside 1500 Cliftview Avenue.  *Id.*  A few minutes later, Wilford entered 1500 Cliftview Avenue.  *Id.*

On April 27, 2011, agents observed another large box in the dumpster located at Belvedere Towers.  *Id.* ¶ 21.  The box was the same size as the boxes exchanged previously between Wilford

and Hayes.  ECF 273, ¶ 21.  The shipping label listed 35 Mainview Court in Reisterstown, Maryland as the recipient address.  As noted, the residence was owned by Derrick Barbour.  *Id*.

The federal indictment followed on May 5, 2011.  As noted, it named Hayes as well as Wilford, Plunkett, Williams, Nyakana, and Hawkins.  ECF 1.  Coconspirators Michael Smooth, Alvin Wells, Derrick Barbour, Richard Tates, Antoine Goodson, and Keith Hill were charged in the Circuit Court for Baltimore City.  ECF 273, ¶ 22 n.1.

Hayes and Plunkett were arrested during the week of May 16, 2011.  *Id*. ¶ 22.  At the time of their arrests, they had 1.5 kilograms of crack cocaine in their possession.  *Id*.  A small amount of powder and crack cocaine was also seized from Apartment 717 at Belvedere Towers.  *Id*.

Wilford's residence at 1500 Cliftview Avenue was searched on or about May 16, 2011. ECF 205 at 18.  A hollowed-out computer shell, a large cardboard box, and a mold for forming a kilogram of narcotics were seized.  ECF 273, ¶ 23.  The box was the same size as the boxes exchanged previously between Wilford and Hayes.  *Id*.

Plunkett's residence was also searched on or about May 16, 2011.  ECF 205 at 18.  The sum of $200,000 in U.S. currency was recovered, along with wrappers for kilograms of cocaine and other drug items.  *Id*.

And, Hayes's residence was also searched on the same date.  *Id*.  Agents recovered $300,000 in U.S. currency from Hayes's residence.  *Id*.

A shipment of cocaine sent to the Cliftview Avenue address was intercepted and seized on or about May 20, 2011.  It contained approximately eight kilograms of cocaine hydrochloride. ECF 273, ¶¶ 23, 28.  The cocaine was concealed inside of a hollow computer shell, and the shipping box was the same size as the boxes exchanged previously between Wilford and Hayes.  *Id*.

Approximately $1.6 million dollars in U.S. currency was seized during a search of the residence at 3530 Seapines Circle in Reisterstown, Maryland.  ECF 273, ¶ 24.  Testimony at trial indicated that Wilford had a key to the residence and stored cash at that location.  *Id.*

Wilford's residence in Elkton was also searched and agents seized a small amount of currency, receipts for six UPS shipments to California, and materials for wrapping and shipping currency. *Id.* ¶ 25.  Testimony at trial indicated that the residence was sometimes used as a location to prepare large sums of U.S. currency for shipment to California.  *Id.*

UPS shipping records indicated that Wilford shipped at least 28 packages to California, using fake names.  *Id.*  According to UPS shipping records, in 2010 and 2011, six shipments of cocaine were made to 35 Mainview Court in Reisterstown, Maryland, and eighteen shipments of cocaine were made to 1500 Cliftview Avenue, including the shipment intercepted on or about May 20, 2011.  *Id.* ¶¶ 23, 28.

Hayes's sentencing was held on August 8, 2012.  ECF 142.  He was 38 years old.  ECF 680 (Hayes Presentence Report or "PSR") at 1.[4]  The PSR reflected a base offense level of 36.  *Id.* ¶ 13.  However, defendant was deemed a career offender under U.S.S.G. § 4B1.1, based on his four prior convictions for possession with intent to distribute cocaine, discussed *infra*.  *Id.* ¶ 21. As a result, Hayes's offense level was increased to 37, pursuant to U.S.S.G. § 4B1.1.  *Id.*  After three deductions for acceptance of responsibility under U.S.S.G. § 3E1.1 (*id.* ¶¶ 19, 22), Hayes had a final offense level of 34.  *Id.* ¶ 23.

---

[4] Hayes's PSR was not docketed at the time of sentencing.  But, I located a copy in the Chambers file and submitted it for docketing. The PSR was originally prepared on June 8, 2012, but was revised on July 18, 2012, and on August 8, 2012, after sentencing. *See id.* at 2. I cite to the revised PSR of August 8, 2012.  *See* ECF 680.

Defendant had five prior adult criminal convictions in Maryland.  ECF 680, ¶¶ 27-42.  As noted, four of them were for possession with intent to distribute cocaine, all in the Circuit Court for Baltimore City.  *See id*. ¶¶ 27-38.

The first felony drug conviction occurred in 1993, and resulted in a sentence of five years of incarceration, all suspended, and 18 months of probation.  *Id*. ¶¶ 27-29.  However, after a probation violation, defendant was sentenced in 1994 to two years of incarceration, concurrent with the sentence for his 1994 convictions, discussed below.  *Id*. ¶ 27.

In 1994, defendant was charged in two separate cases with possession with intent to distribute cocaine.  One offense occurred on February 8, 1994 (*id.* ¶ 30) and the other on March 22, 1994.  *Id.* ¶ 33.  Two firearms were also recovered in connection with the first case.  *Id*. ¶ 32.  Hayes was found guilty in both cases on May 17, 1994.  *Id*. ¶¶ 30-35.  He was sentenced to five years of incarceration for the first case and five years of incarceration, concurrent, for the second case, both concurrent with the sentence imposed for the probation violation.  *Id*. ¶¶ 27, 30, 33.

Defendant was again convicted of possession with intent to distribute cocaine in 1999, for which he was sentenced to nine years of incarceration.  *Id*. ¶¶ 36-38.  He was paroled in 2003.  *Id*. ¶ 36.

Defendant's fifth criminal conviction occurred in the District Court for Baltimore City, also in 1999, for second degree assault.  *Id*. ¶¶ 39-42.  He was sentenced to 90 days of incarceration.  *Id*. ¶ 39.

These convictions yielded a criminal history score of 13 points, which equates to a criminal history category of VI.  *Id*. ¶ 43.  Alternatively, because defendant was classified as a career offender, his criminal history category was VI under U.S.S.G. § 4B1.1.  *Id*. ¶ 44.

A total offense level of 34, and a criminal history category of VI, produced a Guidelines range of 262 to 327 months of imprisonment.  ECF 680, ¶ 53.  The PSR also noted that defendant's charge carried a mandatory minimum sentence of ten years of imprisonment, pursuant to 21 U.S.C. § 841(b)(1)(a)(ii).  *Id*. ¶ 52.

Hayes is six feet tall and, at sentencing, he weighed 215 pounds.  *Id*. ¶ 70.  Defendant reported being in good health, and that he was not prescribed any medications.  *Id*.  He advised that he had first tried marijuana at age 11, using it daily until his arrest.  *Id*. ¶ 71.  In addition, he first tried cocaine at age 14, using it occasionally until his arrest.  *Id*.  And, he first consumed alcohol at age ten, using it daily until his arrest.  *Id*. ¶ 72.

Defendant described his childhood as "good," noting that his needs were met.  *Id*. ¶ 62.  But, he indicated that his father was physically abusive towards both him and his mother.  *Id.*  Defendant is the father of two children, born to different mothers.  *Id*. ¶¶ 63, 64.  As of sentencing, his children were 17 and 22 years old, and defendant reported having daily contact with them until his arrest.  *Id*. ¶¶ 63, 64.  Hayes dropped out of high school, but stated that he obtained his G.E.D. while previously incarcerated.  *Id*. ¶ 74.[5]

In accordance with the terms of the Plea Agreement, the Court sentenced Hayes to a below Guidelines sentence of 180 months of incarceration.  ECF 144 (Judgment) at 2.  BOP records reflect that Hayes received credit for the period between May 16, 2011, and August 7, 2012, when he was in pretrial detention.  *See* ECF 624-1 at 3.  The Court also imposed a five-year term of supervised release.  ECF 144 at 3.  In addition, the Court approved a consent order of forfeiture.  ECF 141.

---

[5] Conversely, the Motion asserts that Hayes is "currently pursuing his GED." ECF 611 at 8.

Defendant was previously held at FCI Allenwood Low.  *See* ECF 662 at 1.  But, as noted, he has recently been transferred to a halfway house.  *See Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited July 5, 2022); *see also* ECF 677.

Medical records indicate that Hayes contracted COVID-19 in December 2011, although they also note that Hayes "denie[d] symptoms."  ECF 611-1 at 1.  Records also reflect that Hayes declined to receive the COVID-19 vaccination in February 2021.  ECF 624-4 at 1.  The Reply suggests that "there are legitimate reasons, grounded in Hayes' personal history with the medical staff at Allenwood, as to why he might have trepidation about these vaccines," and also notes he contracted COVID-19 before he was offered the vaccine.  ECF 627 at 4.  There is no indication, including in the supplement submitted in January 2022 (ECF 662), that Hayes has ever received the vaccine.

In the Motion, Hayes represents that, if released, he would reside with a family friend at her home in Baltimore, and he has secured a job at Mrs. Carter's Kitchen.  ECF 611 at 9-10.  As noted, Hayes is now at a halfway house.

Hayes submitted an administrative request for compassionate release to the Warden of FCI Allenwood Low on December 24, 2020.  ECF 611-2.  On January 8, 2021, the Warden denied the request.  *Id*.  The government does not contest that Hayes has exhausted the administrative requirements for compassionate release.  *See* ECF 624 at 17.

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of

finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see* *Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule of finality. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984. Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020). As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to

reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release.  *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021); *see also Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3)

the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.  Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.  But, the Fourth Circuit has said that, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release.  *See McCoy,* 981 F.3d at 276-77.[6]  In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes

---

[6] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act. *McCoy*, 981 F.3d at 276. Of significance here, it is only "directed at BOP requests for sentence reductions." *Id.* (citing U.S.S.G. § 1B1.13). "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo*, 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). In other words, the policy statement does not apply to this Court.

Indeed, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95. Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197. Notably, "successful rehabilitation efforts can be

considered" in regard to the analysis of extraordinary and compelling reasons. *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam).  And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'"  *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t).

Moreover, the Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169.  However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.  Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See, e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).  But, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States v. Jones*, No. 22-6071, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that

"a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, No. 21-6380, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

As mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant. *McCoy*, 981 F.3d at 284 (citation omitted); *see Jenkins*, 22 F.4th at 169. Nevertheless, compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187. But, a district court abuses

18

its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted). And, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

### III. COVID-19

### A.

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[7] COVID-19 spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life." Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, REUTERS (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of July 5, 2022, COVID-19 has infected approximately 87.9 million Americans. *See*

---

[7] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (last accessed June 15, 2020).

*COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed July 5, 2022).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.* That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus. The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney

20

disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.   But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.   In May 2022, it updated its guidance to reflect the most available data.   *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 2, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.   *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.   *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.   Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195.  In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson).[8]  Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC News, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188. Approximately 67% of the total U.S. population is fully vaccinated, including 30% of people from ages 5 to 11, 60% of people from ages 12 to 17, 73% of people from ages 18 to 64, and 92% of people age 65 and up.  *See How Vaccinations Are Going in Your County and State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited July 5, 2022).

Moreover, approximately 106.3 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older.  *See id.*; *COVID-19*

---

[8] Questions as to the efficacy of the Johnson & Johnson vaccine were raised as to the Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron -study*, Reuters (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J.&J. Vaccine May Be Less Effective Against Delta, Study Suggests*, N.Y. Times (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

*Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated Jun. 13, 2022). And, federal regulators approved a second booster dose for individuals age 50 and older. *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."). But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021),

https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, both around the world and in the United States.  It sparked further cause for concern, because it was highly contagious.  *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021).  Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases.  *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Then, the number of COVID-19 cases again declined.  *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7, 2022),          https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.   And, the country began to return to normalcy.

Nevertheless, the respite did not last long.  We soon experienced a surge in COVID-19 cases.  *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html.   Indeed, a new subvariant of the virus began "spreading rapidly and will probably become the dominant form of the virus in the United States in the next few weeks."   *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases.   And, the "Biden administration is preparing for the possibility that 100 million Americans will be infected with the coronavirus this fall and winter . . . ."   Amelia

Nirenberg, *A Coming Fall Surge?*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/2022/05/09/briefing/100-million-coronavirus-covid-us.html.

**B.**

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020). And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe,'* WASH. POST (Aug. 24, 2020) (reporting use of non-

reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[9]

---

[9] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020),

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020

---

https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

On January 4, 2021, at about the time of the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance  (Jan.  4,  2021),  https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf.  It provides that administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec.  21,  2020),  https://www.forbes.com/sites/walterpavlo/2020/12/21/  federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.  As  of  July  1, 2022, the BOP had 140,237 federal inmates and approximately 36,000 staff.  And, by that date, the  BOP  had  administered  322,933  vaccine  doses  to  staff  and  inmates.  *See* https://www.bop.gov/coronavirus/ (last accessed July 5, 2022).

As of July 1, 2022, the BOP reported that 444 federal inmates, out of a total population of 140,321, and 356 BOP staff, out of some 36,000 staff members, currently tested positive for

COVID-19.  Moreover, 50,141 inmates and 13,038 staff have recovered from the COVID-19 virus.

In addition, 299 inmates and seven staff members have died from the virus.   The BOP has

completed 128,711 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

### III. Discussion

The Motion argues that, in the context of COVID-19, defendant's health conditions

constitute an extraordinary and compelling circumstance warranting his release.  In particular, the

Motion cites to defendant's prediabetes, what it describes as his "undiagnosed hypertension," and

the fact that he contracted COVID-19 in December 2020.  ECF 611 at 3-7.  In addition, the Motion

notes defendant's weight issues; his BMI has fluctuated between 26.9 and 30.1 while he has been

incarcerated.  *Id*. at 5-6 (citing BOP medical records).  The government disputes that defendant's

medical conditions are serious enough to support a finding of extraordinary and compelling

circumstances.  ECF 624 at 19-25.

As noted, Hayes refused the COVID-19 vaccine in February 2021.  *See* ECF 624-4.  In the

Reply, Hayes argues that he should not be penalized for declining the vaccine, given that he had

already contracted COVID-19; he has a "personal history with the medical staff at Allenwood,"

which is unexplained; "the amount of disinformation inmates are receiving about the vaccine;"

and the fact that others, including correctional facility staff, are declining the vaccine.  ECF 627 at

4-5.  There is no indication Hayes has since been vaccinated.  Indeed, the issue is not mentioned

in defendant's supplemental briefing of January 11, 2022, which is focused on the dangers of

COVID-19.  *See* ECF 662.

Judge Stephanie Gallagher has previously observed: "Courts now widely recognize that a

refusal to take preventative measures to protect oneself from COVID-19 undermines any assertion

that the risk of viral infection constitutes an extraordinary and compelling reason justifying

release . . . . Any decision to the contrary would create a perverse incentive in favor of declining the vaccine, undermining the BOP's efforts to protect its incarcerated population and to allow prison operations to return to some degree of normalcy in the coming months." *United States v. Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases); accord *United States v. Manon*, Crim. No. 16-00460 (SDW), 2022 WL 408958, at *3 (D.N.J. Feb. 10, 2022); *United States v. Carter*, 3:19-cr-356, 2022 WL 272196, at *2-3 (N.D. Ohio Jan. 28, 2022); *United States v. Culp*, 92-cr-81058, 2021 WL 5834312, at *2 (E.D. Mich. Dec. 9, 2021); *United States v. Highight*, 4:14-CR-129(4), 2021 WL 5299249, at *6 (E.D. Tex. Nov. 12, 2021); *United States v. Brice*, SAG-07-0261, 2021 WL 1926713, at *3 (D. Md. May 13, 2021); *United States v. Siegel*, TDC-03-0393, 2021 WL 962491, at *2 (D. Md. Mar. 15, 2021).  Nor do I find any of the arguments offered in the Reply as to why the Court should overlook defendant's vaccine refusal particularly persuasive.

Even beyond defendant's rejection of the COVID-19 vaccine, I am skeptical that defendant's health conditions present an extraordinary and compelling circumstance under the compassionate release statute.  I am mindful that the CDC's criteria are not binding in the analysis of whether a health condition qualifies as an extraordinary or compelling basis for compassionate release. *See Hargrove*, 30 F.4th at 194.  Nevertheless, the CDC criteria provide useful information. And, the CDC affirms that diabetes can make someone more likely to get seriously ill from COVID-19.  *See People with Certain Medical Conditions*, *supra*.  But, it does not make the same assertion as to defendant's condition of prediabetes.  *See id*.

Consistent with the CDC's guidance, a number of courts have found that prediabetes alone is not sufficient to constitute an extraordinary and compelling reason in the context of COVID-19. *See, e.g*., *United States v. Manning*, 5 F.4th 803, 807 (7th Cir. 2021) (noting prediabetes is not

recognized by the CDC as increasing risk); *United States v. Evans*, CCB-18-234, 2021 WL 3725421, at *1 (D. Md. Aug. 23, 2021) (same); *United States v. Freeman*, No. 13-CR-50071, 2021 WL 843456, at *1 (N.D. Ill. Mar. 5, 2021) (same); *United States v. Mungarro*, No. 07-20076, 2020 WL 6557972, at *2-3 (E.D. Mich. Nov. 9, 2020) (noting roughly one in three Americans are prediabetic); *United States v. Hall*, JKB-04-323, 2020 WL 4582712, at *2 (D. Md. Aug. 10, 2020).

Aside from prediabetes, the Motion states, apparently based on defendant or counsel's own analysis (ECF 611 at 5): "Hayes' medical records suggest that he has been living with undiagnosed hypertension . . . ."  And, as to defendant's weight, the Motion states that as of April 1, 2019, defendant's BMI was 26.9, although before this date his BMI has been recorded as high as 30.1. *Id*. at 5; *see* ECF 611-1 at 31.[10]  The CDC defines "overweight" as having a BMI of between 25 and 30.  *See People with Certain Medical Conditions*, *supra*.  Thus, a BMI of 26.9 is only modestly overweight.

And, a number of courts have declined to find grounds for compassionate release, even when considering defendants with similar or greater BMIs.  *See, e.g.*, *United States v. Waugh-Hixon*, PWG-19-137, 2021 WL 4750713, at *3 (D. Md. Oct. 21, 2021) (BMI of 30); *United States v. Jones*, RDB-10-232, 2021 WL 2805947, at *3 (D. Md. July 6, 2021) ("Several district courts have held that obesity is not individually sufficient for a finding that there are circumstances akin to the 'extraordinary and compelling reasons' which justify compassionate release."); *United States v. Moore*, Crim. No. 18-474, 2021 WL 308331, at *2 (E.D. Penn. Jan. 29, 2021) (finding that defendant's "slightly elevated BMI of 25 does not justify his release," and noting that "Courts have consistently denied compassionate release to inmates with significantly higher BMI levels");

---

[10] This appears to be the most recent BMI statistic provided in the Motion or its supporting materials. Subsequent briefing does not identify a more recent figure.

*United States v. Carter*, PWG-17-0529, 2021 WL 307417, at *3 (D. Md. Jan. 29, 2021) (noting "multiple cases denying compassionate release to defendants with obesity *and* a preexisting condition that increased defendants' risk of severe illness"); *United States v. Peaks*, No. 16-20460, 2020 WL 2214231 (E.D. Mich. May 7, 2020) (inmate with BMI of 44 and hypertension does not meet test for extraordinary and compelling circumstances).

Even when a court finds an extraordinary and compelling reason for compassionate release, such relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).   *See High*, 997 F.3d at 186.   The § 3553(a) factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *Id.*

In my view, even assuming, arguendo, that defendant's health status constitutes an extraordinary and compelling circumstance, denial of the Motion is warranted on the basis of the § 3553(a) sentencing factors.[11]

To begin, defendant's offense was extremely serious.  Hayes was regarded as a leader of a significant and sophisticated drug trafficking organization that trafficked huge quantities of cocaine and involved enormous amounts of money.  As the government puts it in the Opposition (ECF 624 at 25-26): "During the investigation of the Hayes DTO, it was determined that Hayes was the leader of the DTO and was responsible for obtaining huge, kilogram-quantities of cocaine

---

[11] To the extent that defendant's Motion is predicated on concerns about imprisonment during COVID-19, the issues have been ameliorated, at least to some extent, by virtue of the defendant's transfer to a halfway house.

from California, processing and packaging the cocaine, and distributing the cocaine in the greater Baltimore metropolitan area." *See also, e.g.*, ECF 273, ¶ 33; ECF 389 (Wilford Sentencing Tr.) at 100.

The Motion notes that defendant's offense "involved no allegations of violence or weapons." ECF 611 at 8.  This is accurate.  However, it is also well known that drug trafficking often leads to violence.  *See United States v. Blackwell*, JKB-10-493, 2020 WL 833571, at *2 (D. Md. Feb. 19, 2020) ("There is no serious dispute that the illegal drug business brings with it violence, often lethal and on a large scale. The Court finds and concludes that those who participate in and profit from large scale, illegal drug trafficking activities are engaging in conduct that at least indirectly leads to widespread violence.").

Furthermore, and of significance to the Court, defendant has a serious criminal history, resulting in a criminal history category of VI, separate from his career offender designation.  *See* ECF 680, ¶ 43.  Four of defendant's five prior criminal convictions were for the offense of possession of cocaine with intent to distribute.  It is true that the most recent of these convictions occurred in 1999.  But, defendant was not paroled from his sentence for that offense until 2003. That was about seven years before the start of the instant offense.  *See* ECF 110 at 10; ECF 680, ¶ 36.

Notably, the record reflects that the State's criminal justice system was generally quite lenient with defendant.  Most of his prior sentences were relatively short and/or they were imposed concurrently.  The sentence that Hayes received in 1999 was the longest sentence that he had ever received or served.  Although Hayes served only a portion of that sentence, because Maryland provides for parole, the sentence did not lead Hayes to change his ways; it did not deter him from further criminal conduct.

In sum, the 180-month sentence that Hayes received pursuant to his Plea Agreement was amply warranted. And, it was some 80 months below the bottom of his Guidelines range. *See* ECF 680, ¶ 53.

Nevertheless, in considering a motion under the First Step Act, courts often look to a defendant's post-sentencing conduct, because it "provides the most up-to-date picture of [his] 'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)). Rehabilitation efforts can be considered, although rehabilitation alone cannot serve as a basis for compassionate release. *Davis*, 2022 WL 127900, at *1; *see Cohen*, 2022 WL 2314300, at *1 (indicating that district judge erred by failing to consider "positive postsentencing conduct"); *Lancaster*, 997 F.3d at 175 ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *United States v. McDonald*, 986 F.3d 402, 410-12 (4th Cir. 2021) (noting that on a motion to reduce sentence under the First Step Act, district court must consider defendant's post-sentencing conduct); *United States v. Randall*, 837 Fed. App'x 1008, 1009 (4th Cir. 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct).

The Motion cites to defendant's rehabilitative efforts while incarcerated. ECF 611 at 8. In particular, as of the time the Motion was filed, Hayes had incurred only a single disciplinary infraction, for refusing a work assignment in 2018. ECF 611-3 at 1. In addition, Hayes took a large number of educational and vocational courses; was making progress towards his G.E.D.; and had started the Residential Drug Abuse Program before it was paused due to the pandemic. ECF

611 at 8; ECF 611-4 at 1-2.  Defendant's rehabilitative efforts are laudable.  But, I do not find that Hayes's rehabilitation is sufficient to tip the scales in favor of compassionate release.

As part of the § 3553(a) analysis, many judges in this District have considered a change in the sentencing law landscape that a defendant would face if prosecuted today for the same offense. As Judge Bennett has explained: "[C]hanges in the sentencing law landscape are relevant to the Court's analysis of whether the Court's sentence appropriately addresses 'the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public." *United States v. Johnson*, RDB-07-0153, ECF No. 183 at 10-11 (D. Md. Oct. 14, 2020).  *See also, e.g., Jones*, 2022 WL 2303960, at *1 (recognizing that courts have discretion "to *consider* leniency" in light of charges in current law) (emphasis in *Jones*); *McCoy*, 981 F.3d at 285-86; *United States v. Stockton*, ELH-99-352, 2021 WL 1060347, at *14 (D. Md. Mar. 17, 2021); *United States v. Chandler*, GLR-05-0181, ECF 119 at 1-2 (D. Md. May 14, 2020); *United States v. Laurey*, JKB-06-0586, ECF 81 at 1, 3 (D. Md. Feb. 19, 2020); *United States v. Wesley*, JKB-10-0118, ECF 73 at 1 (D. Md. Feb. 18, 2020); *United States v. Smith*, DKC-98-0252, ECF 92 at 4 (D. Md. Feb. 14, 2020); *United States v. Watts*, PJM-06-036, ECF 114 at 7 (D. Md. Feb. 6, 2020); *United States v. Thompson*, CCB-09-0128, ECF 123 at 2 (D. Md. Jan. 16, 2020).

The Motion does not raise any changes to sentencing law following defendant's conviction. As noted, Hayes was classified as a career offender.  Under U.S.S.G. § 4B1.1(a), a defendant is a career offender if, *inter alia*, "the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense" and "the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense."

The instant offense is drug conspiracy.  Therefore, it would appear that defendant's career offender designation would no longer be proper in light of *United States v. Norman*, 935 F.3d 232, 238-39 (4th Cir. 2019).  There, the Fourth Circuit determined that federal drug conspiracy under 18 U.S.C. § 846 is categorically not a qualifying offense for career offender purposes under U.S.S.G. § 4B1.2(b).

Nevertheless, this change in the law would have no impact on defendant's sentence.  As a career offender, defendant had a total offense level of 34 and a criminal history category of VI, resulting in a Guidelines range of 262 to 327 months of incarceration.  ECF 680, ¶¶ 22, 34, 53.  If he were not a career offender, defendant would have had a total offense level of 33 and a criminal history category of VI, resulting in a Guidelines range of 235 to 293 months of incarceration.  *Id*. ¶¶ 20, 43.  And, defendant's Plea Agreement contemplated—and the Court imposed—a term of imprisonment of 180 months, substantially lower than either range.

As noted, defendant has already been released to a halfway house.  *See* ECF 677. Nevertheless, he asks the Court to decide the Motion, which is based on his increased vulnerability to COVID-19 in a prison (or group) setting.  Considering the gravity of defendant's offense, his criminal history, and the other factors discussed above, the Court sees no basis to grant compassionate release.

### IV. Conclusion

As mentioned, compassionate release is a "rare" remedy.  *White*, 378 F. Supp. 3d at 787. And, it is reserved for the "most grievous cases."  *McCoy*, 981 F.3d at 287.  The Court must make an "individualized assessment[ ]," *id*. at 286; *see also Harris*, 2022 WL 636627, at *1; *Davis*, 2022 WL 127900, at *1-2.  For the reasons stated above, this is not a case in which compassionate release is appropriate.  I will deny the Motion, without prejudice.

An Order follows, consistent with this Memorandum Opinion.


Date: July 6, 2022                                    _____/s/_____

                                                     Ellen L. Hollander
                                                     United States District Judge